JUDGE SWAIN

06 CV 6483

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>FREDERICK J. O'MEALLY, )<br>JASON N. GINDER, )<br>MICHAEL L. SILVER and )<br>BRIAN P. CORBETT, )<br>)<br>Defendants. )<br>) | Civil Action No.  |

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission") alleges the following against defendants Frederick J. O'Meally, Jason N. Ginder, Michael L. Silver, and Brian P. Corbett:

## SUMMARY

1.      Defendants O'Meally, Ginder, Silver and Corbett were registered representatives (*i.e.*, brokers) in branch offices of Prudential Securities, Inc. ("PSI") located in the New York City area.  From at least January 2001 until September 2003, they defrauded dozens of mutual fund companies and the funds' shareholders in order to engage in thousands of "market timing" trades worth more than $2.5 billion.

2.      "Market timing" involves the frequent buying, selling or exchanging of mutual fund shares in order to exploit inefficiencies in mutual fund pricing.  Though not illegal *per se*,

market timing can harm mutual fund shareholders in several respects, and beginning in the late 1990s, many mutual fund companies began to impose restrictions on excessive trading in their funds. If a fund company determined that a particular customer or broker had violated its trading limits, it typically refused to accept additional transactions from that customer or broker.

3.     The defendants knew that certain mutual fund companies monitored activity in their funds for excessive trading. To make their market timing harder to detect, the defendants opened more than 750 accounts for what were, in reality, only a handful of customers, and they submitted trades using dozens of broker identification numbers (called "FA numbers" at PSI). When a fund company managed to identify certain accounts and FA numbers as engaged in market timing, the defendants used accounts and FA numbers that had not yet been blocked to evade the restrictions and continue trading. The defendants' use of multiple accounts and FA numbers concealed their and their customers' identities and thus misled the fund companies into processing trades from brokers and customers whose business they wanted to reject.

4.     Through the activities alleged in this Complaint, defendants O'Meally, Ginder, Silver and Corbett violated Section 17(a) of the Securities Act of 1933 ("Securities Act") and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder.

5.     Accordingly, the Commission seeks: (a) entry of a permanent injunction prohibiting the defendants from further violations of the relevant provisions of the Securities Act, the Exchange Act, and the rules thereunder; (b) disgorgement of the defendants' ill-gotten gains, plus prejudgment interest; and (c) the imposition of a civil penalty against each defendant due to the egregious nature of their violations.

## JURISDICTION

6.     The Commission seeks a permanent injunction and disgorgement of ill-gotten gains pursuant to Section 20(b) of the Securities Act [15 U.S.C. §77t(b)] and Section 21(d)(1) of the Exchange Act [15 U.S.C. §78u(d)(1)].  The Commission seeks the imposition of civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. §77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)].

7.     This Court has jurisdiction over this action pursuant to Sections 20(d) and 22(a) of the Securities Act [15 U.S.C. §§77t(d), 77v(a)] and Sections 21 and 27 of the Exchange Act [15 U.S.C. §§78u, 78aa].  Many of the acts and transactions alleged in this Complaint occurred in this District.

8.     In connection with the conduct described in this Complaint, the defendants directly or indirectly made use of the mails or the means or instruments of transportation or communication in interstate commerce.

## DEFENDANTS

9.     **O'Meally**, age 45, lives in Bay Shore, New York.  He joined PSI in 1994.  During the relevant period, he was employed by PSI as a registered representative, first in the Liberty Plaza branch in Manhattan and then in the Garden City branch on Long Island.  His employment was terminated in October 2003 following an investigation by the joint venture that had purchased PSI's retail brokerage business.

10.     **Ginder**, age 42, lives in New Fairfield, Connecticut.  He joined PSI in early 2000. During the relevant period, he was employed by PSI as a registered representative in the "Special

Accounts" branch in Manhattan.  His employment was terminated in October 2003 following the investigation mentioned above.

11.     **Silver**, age 35, lives in Woodcliff Lake, New Jersey.  He joined PSI in 1996.  During the relevant period, he was employed by PSI as a registered representative in the Madison Avenue branch in Manhattan.  He resigned from the joint venture mentioned above in March 2004.

12.     **Corbett**, age 34, lives in Sea Cliff, New York.  He joined PSI in 1995.  During the relevant period, he was employed by PSI as a registered representative whose primary responsibility was to assist O'Meally.  His employment was terminated in October 2003 following the investigation mentioned above.

### RELATED PARTY

13.     Prior to July 1, 2003, **Prudential Securities, Inc.** ("PSI") was a registered broker-dealer and investment adviser that was a wholly-owned subsidiary of Prudential Financial, Inc. ("Prudential Financial").  Prudential Financial is a publicly-traded holding company whose operating subsidiaries offer a wide range of insurance, investment management services, and other financial products.  On July 1, 2003, Prudential Financial transferred the assets relating to PSI's retail brokerage operations in the United States to a newly-formed joint venture owned by Prudential Financial and Wachovia Corporation.  (The joint venture is now named Wachovia Securities Financial Holdings, LLC.)  In September 2003, the joint venture conducted an internal investigation of market timing by PSI brokers.

4

## STATEMENT OF FACTS

### Market Timing in Mutual Fund Shares

14.     Market timing in mutual fund shares involves the frequent buying and selling of shares of the same mutual fund, or the frequent exchanging of mutual fund shares within the same fund complex, in order to exploit inefficiencies in mutual fund pricing.  Though not illegal *per se*, market timing can harm mutual fund shareholders in several respects:  (a) it can dilute the value of the shareholders' shares; (b) it can disrupt the management of the mutual fund's investment portfolio; and (c) it can impose significant administrative costs for the fund.

15.     Beginning in the late 1990s, many mutual fund companies determined that market timing harmed their long-term shareholders.  As a result, some began to impose restrictions on excessive trading.  Some fund companies imposed a limit on the number of transactions that an account holder could effect within a certain time period (*i.e.*, no more than one exchange per quarter).  Other fund companies formally reserved the right to reject "excessive" or "abusive" trading without providing a specific definition of those terms.  In many instances, language concerning restrictions on excessive trading was added to the fund's prospectus.

16.     To implement these restrictions on excessive trading, some fund companies began to monitor transactions in their funds, often screening for frequent transactions by the same customer, frequent transactions by the same broker, and transactions above a particular size (*i.e.*, transactions larger than $50,000 or $200,000).  Typically, if a fund company determined that a particular customer or broker had violated its trading limits, it would refuse to accept additional transactions from that customer or broker (other than a redemption of the customer's investment).

**The Defendants and Their Market Timing Customers**

17.     O'Meally led a team of brokers and assistants who spent most of their time on market timing transactions.  O'Meally rarely appeared in the office, though he was in frequent contact with his team by phone, and Corbett directed the team's day-to-day activities, even sending emails to other PSI personnel under O'Meally's name.  All the team's market timing activities, including the opening of new customer accounts, the obtaining of new FA numbers, and the submission of mutual fund transactions using those accounts and FA numbers, were made at O'Meally's direction or in accordance with his instructions.

18.     O'Meally had five principal customers for whom his team placed market timing transactions.  The customers, each of whom acted as investment adviser for various hedge funds, were:  (a) Atlantique Capital Advisors LLC ("Atlantique"), based in New York; (b) Canary Capital Partners ("Canary"), based in New York; (c) Heuristic Advisors LLC ("Heuristic"), based in New York and a subsidiary of Delphi Financial Group; (d) E.D.&F. Man, Inc., later known as Man Financial, Inc. ("Man Financial"), based in Chicago; and (e) Samaritan Asset Management Services LLC ("Samaritan"), based in Chicago.  Man Financial and Samaritan each had two sub-advisers – Alastor Capital Management ("Alastor"), based in San Jose, California, and Johnson Capital Management ("Johnson"), based in Fairfax, Virginia.

19.     O'Meally received permission from PSI to charge his market timing customers a fixed fee based on assets under management, rather than a commission on certain transactions.  During the relevant period, PSI received approximately $9.8 million in fees from O'Meally's market timing customers, of which O'Meally himself received approximately $4.7 million, making him the top producing broker at PSI.

6

20.     Ginder led a team of brokers and assistants who spent most of their time on market timing transactions. All the team's market timing activities, including the opening of new customer accounts, the obtaining of new FA numbers, and the submission of mutual fund transactions using those accounts and FA numbers, were made at Ginder's direction or in accordance with his instructions.

21.     Ginder had two principal customers for whom his team placed market timing transactions. The customers, each of whom acted as investment adviser for various hedge funds, were: (a) Brandywine Asset Management, Inc. ("Brandywine"), based in Thornton, Pennsylvania; and (b) Millennium Partners, L.P. ("Millennium"), based in New York.

22.     During the relevant period, PSI received approximately $6.6 million in gross commissions from Ginder's market timing customers, of which Ginder himself received approximately $1.3 million in net commissions, putting him in the top ten among PSI brokers.

23.     Silver led a team of brokers and assistants who spent most of their time on market timing transactions. All the team's activities, including the opening of new customer accounts, the obtaining of new FA numbers, and the submission of mutual fund transactions using those accounts and FA numbers, were made at Silver's direction or in accordance with his instructions.

24.     Silver had four principal customers for whom his team placed market timing transactions. The customers, each of whom acted as investment adviser for various hedge funds, were: (a) Granite Group Advisors, LLC ("Granite"), based in Purchase, New York; (b) Haidar Capital Management, LLC ("Haidar"), based in New York; (c) Millennium; and (d) Peconic Partners, LLC ("Peconic"), based in New York.

25.     During the relevant period, PSI received approximately $5.3 million in gross commissions from Silver's market timing customers, of which Silver himself received approximately $1 million in net commissions, putting him in the top twenty among PSI brokers.

26.     The defendants' customers invested in mutual funds offered by U.S. fund companies, routinely buying shares in one or two funds offered by a fund complex and then exchanging into other funds within that complex on a weekly and sometimes daily basis.  Each customer made its decisions to buy, sell and exchange shares in certain mutual funds based on proprietary quantitative analysis of market information.  The defendants and their teams played no role in the customers' quantitative analysis, but they sometimes recommended certain mutual funds or fund companies that might suit the customers' investment needs.

27.     The customers' market timing activities generated hundreds, if not thousands, of separate transactions almost every day.  Typically, the investment adviser for each customer would send a facsimile or email to the defendants listing hundreds of potential transactions, and later in the day (often shortly before the close of trading at 4:00 p.m.), the adviser would contact the defendants to activate certain of the trades.  Information about the transactions was then entered into a computer system at PSI (called "BOSS 3000") for transmission to the fund companies.  (The volume of O'Mealy's market timing was so great that PSI supplied his team with a special computer software package, the "LIST" system, to facilitate the entry of mutual fund transactions and by-pass the BOSS 3000 system.)

28.     The defendants typically submitted their mutual fund transactions through the National Securities Clearing Corporation ("NSCC"), a centralized trade clearance and settlement system.  To place trades through NSCC, a PSI broker was required to identify himself by FA

number and to provide the number of the customer account for which the trade was placed.  The

FA number and account number usually included a prefix for the PSI branch which submitted the

trade.  On some occasions, transactions placed through NSCC included the name on the

customer's account and/or the name of the broker(s) to whom the FA number belonged.

**General Description of the Fraudulent Scheme**

29.     Although it was comprised of thousands of separate transactions, the defendants'

fraudulent scheme was really quite simple.  They had customers who wanted to buy, sell or

exchange millions of dollars of mutual fund shares on virtually a daily basis.  They knew that

some mutual fund companies monitored trading in their funds and imposed qualitative or

quantitative restrictions on the frequency of purchases and exchanges.  They knew that, if they

placed their customers' hundreds of transactions involving millions of dollars using a single

customer account and FA number for each customer, it was highly likely that certain fund

companies would reject the transactions as excessive.  As a result, the defendants devised a

scheme to conduct their customers' trading through dozens of customer accounts and multiple

FA numbers.  By splitting a customer's transactions into many smaller components, submitted

under different (and often misleading) customer names using different FA numbers, the

defendants significantly increased the chances that the transactions would evade detection by the

fund companies.  Further, when a fund company did identify and attempt to block certain

accounts or FA numbers from further activity due to excessive trading, the defendants often used

the many accounts and FA numbers that had not yet been blocked to hide their and their

customers' identities and thereby evade the restrictions and continue trading in the same

company's funds.

9

**The Defendants' Use of Multiple Customer Accounts**

30.     The defendants used more than 750 customer accounts to process transactions for their market timing customers.  Many accounts bore the names of shell entities that had no relation to the customer's actual name and thus fostered the misleading impression that transactions for the same customer were really for separate, unrelated entities.  Many other accounts were opened as "confidential" accounts, for which no name at all appeared in transactions submitted to NSCC.  Each team's account numbers used several different branch prefixes, thus compounding the illusion that the many accounts belonged to different customers.

a.     O'Meally's team used nearly 300 accounts for Heuristic, more than seventy for Samaritan, more than fifty for Atlantique, twelve for Man Financial, and ten for Canary.  Many of the accounts had misleading names such as "Greenbrook", "Horsepower", "Lighthouse", "Oracle", "Saltaire", "Slow Money" and "Tripod".  The account numbers used seven different branch prefixes (075, 03N, 0EN, 0SU, 0SZ and 0YH for the Liberty Plaza branch, and 0AA for the Garden City branch).  A list of the accounts used for market timing by O'Meally's customers is attached as **Exhibit A** hereto.

b.     Ginder's team used nearly 150 accounts for Brandywine and more than eighty accounts for Millennium.  Many of the accounts had misleading names such as "Auric Ventures", "Black Castle", "Ellewood", "Gahn & McElroy", "Hickory Notch", "Mazzard" and "Squashapenny".  The account numbers used four different prefixes (ASG, BNG and CGL for the Special Accounts branch, and 0NT for the Long Island branch).  A list of the accounts used for market timing by Ginder's customers is attached as **Exhibit B** hereto.

c.     Silver's team used more than fifty accounts for Millennium, more than thirty accounts for Haidar, ten for Peconic, and nine for Granite.  Many of the accounts had misleading names such as "Gilmore & Gillespie", "Jupiter", "Linkage", "Riverview" and "Wyatt Atwood".  The account numbers used six different prefixes (05M, 0EC, BLM and HSK for the Madison Avenue branch, and AJX and TMP for the White Plains branch).  A list of the accounts used for market timing by Silver's customers is attached as **Exhibit C** hereto.

31.     The defendants did not open their customers' many accounts to pursue different investment strategies.  On the contrary, as set forth below, the defendants frequently used two or more of a customer's accounts to buy shares of the same mutual fund at the same time.  Similarly, the defendants frequently exchanged fund shares held in several of a customer's accounts at the same time, and on nearly every occasion, all of the customer's exchanges reflected the same investment decision (*i.e.*, a transfer from a money market fund to an equity fund in a particular sector, or vice versa).

**The Defendants' Use of Multiple FA Numbers**

32.     FA numbers were used at PSI to open customer accounts, execute securities transactions, and track commissions.  Each broker received a primary FA number, and PSI also provided brokers with "also" numbers, which were typically used so that one of the broker's customers could have online computer access to its account information or could receive a commission discount.  In addition, two or more brokers could obtain a joint number to handle transactions and allocate commissions for a shared customer.

33.     The defendants used many different FA numbers when opening new accounts and placing mutual fund transactions for their market timing customers.

11

     a.     O'Meally's team used thirty-two FA numbers to place market timing transactions during the relevant period.  These included:  (1) one primary and twenty-two "also" numbers belonging to O'Meally; and (2) nine numbers belonging to another broker in the Garden City branch.  A list of the FA numbers used for market timing by O'Meally's customers is attached as **Exhibit D** hereto.

     b.     Ginder's team used twenty-five FA numbers to place transactions for his market timing customers during the relevant period.  These included:  (1) one primary and one "also" number belonging to Ginder; (2) nine primary or "also" numbers belonging to members of his team, to other brokers in the Special Accounts branch and, in one instance, to a broker in the Long Island branch; and (3) fourteen joint numbers that Ginder shared with a business partner (who lived in Boca Raton and had little direct involvement in market timing activities) and, in some instances, with other brokers as well.  A list of the FA numbers used for market timing by Ginder's customers is attached as **Exhibit E** hereto.

     c.     Silver used twenty-one FA numbers to place transactions for his market timing customers during the relevant period.  These included:  (1) one primary and two "also" numbers belonging to Silver; (2) four primary or "also" numbers belonging to other brokers in the Madison Avenue branch; and (3) twelve joint numbers that Silver shared with a business partner (who handled wealthy individual clients and had little direct involvement in market timing activities) and, in some instances, with other brokers as well (including one broker in the White Plains, New York branch).  A list of the FA numbers used for market timing by Silver's customers is attached as **Exhibit F** hereto.

34.    The brokers who agreed to make their primary and "also" FA numbers available to O'Meally, Ginder and Silver for market timing received a small share of the resulting commissions.  The same was true for the brokers whose joint FA numbers were used for market timing by Ginder and Silver.  However, while joint FA numbers were sometimes used at PSI for the legitimate reason of facilitating the allocation of commissions for a shared customer, Ginder and Silver used many more joint FA numbers than would have been necessary for that purpose.  For example, Ginder used eleven joint FA numbers that he shared with his partner, and Silver used five joint FA numbers that he shared with his partner.

**The Defendants' Use of Multiple Accounts and FA Numbers
to Buy and Exchange Mutual Fund Shares**

35.    Between January 2001 and October 2003, the defendants used multiple accounts and FA numbers to buy mutual fund shares worth more than $2.5 billion for their principal customers.

a.    O'Meally's team bought more than $530 million in mutual fund shares for five customers (Atlantique, Canary, Heuristic, Man Financial and Samaritan).  (They also purchased $3 million in mutual fund shares for O'Meally and members of his family.)  A table identifying the total purchases by O'Meally's team from twenty-five leading fund companies, as well as the number of accounts and FA numbers used to make those purchases, is attached as **Exhibit G** hereto.  (Details of each purchase appear in Exhibit J discussed below.)

b.    Ginder's team bought more than $1.2 billion in mutual fund shares for two customers (Brandywine and Millennium).  A table identifying the total purchases by Ginder's team from twenty-five leading fund companies, as well as the number of accounts and FA

numbers used to make those purchases, is attached as **Exhibit H** hereto.  (Details of each purchase appear in Exhibit K discussed below.)

        c.     Silver's team bought more than $820 million in mutual fund shares for four customers (Granite, Haidar, Millennium and Peconic).  A table identifying the total purchases by Silver's team from twenty-five leading fund companies, as well as the number of accounts and FA numbers used to make those purchases, is attached as **Exhibit I** hereto.  (Details of each purchase appear in Exhibit L discussed below.)

        36.     The defendants and their teams regularly used multiple accounts and FA numbers to buy large amounts of a fund company's shares for the same customer on the same day or within a short period of time.  Hundreds of examples are set forth in the company-by-company chronologies attached as **Exhibit J** (O'Meally's team), **Exhibit K** (Ginder's team), and **Exhibit L** (Silver's team) hereto.  These include, without limitation, the following:

        a.     On May 15, 2001, O'Meally's team bought $925,000 of the Franklin U.S. Government Fund for Heuristic using seventeen accounts.  No account bought more than $70,000.

        b.     On June 18 and June 19, 2001, O'Meally's team bought $4.5 million of several American Funds funds for Heuristic using twenty-two accounts and four FA numbers.

        c.     On July 25, 2001, O'Meally's team bought $1.2 million of the American Century Capital Preservation Fund for Heuristic using twelve accounts and three FA numbers.

        d.     On August 22, 2001, Silver's team bought more than $1.2 million of the Putnam International New Opportunities Fund for Haidar using four accounts and two FA numbers.

     e.     On October 10, 2001, Silver's team bought more than $1.1 million of the Federated International Fund for Haidar using four accounts and two FA numbers.

     f.     On November 19 and November 23, 2001, Silver's team bought more than $3.3 million of several American Funds funds for Millennium using five accounts and eight FA numbers.

     g.     On December 4 and December 5, 2001, Silver's team bought more than $4.6 million of several ING funds for Haidar using eight accounts and four FA numbers.

     h.     On December 7, 2001, Ginder's team bought $1.9 million of the Dreyfus Premier New York Municipal Bond Fund for Brandywine using nine accounts and three FA numbers.

     i.     On December 12, 2001, O'Meally's team bought more than $1.5 million of the AIM Intermediate Government Fund for Heuristic using nine accounts and four FA numbers.  The same day, they bought $1 million of the Alliance U.S. Government Bond Fund for Heuristic using six accounts and three FA numbers.

     j.     Between December 18, 2001 and January 4, 2002, Ginder's team bought more than $5.3 million of the Putnam International Equity Fund for Millennium using twelve accounts and four FA numbers.

     k.     Between January 15 and January 23, 2002, Silver's team bought nearly $3 million of the Dreyfus Premier International Growth Fund for Millennium using six accounts and three FA numbers.

     l.     On January 31, 2002, Ginder's team bought $4 million of the AIM International Growth Fund for Brandywine using eight accounts and three FA numbers.

m.      Between February 15 and March 7, 2002, O'Meally's team bought nearly $2.75 million of several Seligman funds for Heuristic using fourteen accounts and four FA numbers.

n.      On March 15, 2002, Silver's team bought $9.73 million of the Putnam International Growth Fund for Millennium using eight accounts.

o.      On March 15 and March 27, 2002, Silver's team bought $16.3 million of the AIM International Growth Fund for Millennium using twelve accounts and four FA numbers.

p.      On March 25 and April 2, 2002, O'Meally's team bought nearly $5 million of several AIM bond funds for Heuristic using thirteen accounts and four FA numbers.

q.      On March 26 and March 27, 2002, Ginder's team bought more than $16 million of the AIM International Growth Fund for Millennium using thirteen accounts and three FA numbers.  On the same two days, they also bought more than $4.4 million of two ING funds for Millennium using ten accounts and three FA numbers.

r.      On October 25, 2002, O'Meally's team bought nearly $1.9 million of the Van Kampen Government Securities Fund for Heuristic using sixteen accounts and two FA numbers.  The same day, they bought more than $1.3 million of the Federated U.S. Government Fund for Samaritan using fourteen accounts and two FA numbers.

s.      On December 27 and December 31, 2002, O'Meally's team bought nearly $500,000 of three Seligman bond funds for Heuristic using twenty-four accounts and four FA numbers.  No account bought more than $25,000.

      t.      On January 29, 2003, Ginder's team bought $6.1 million of the Alliance Bernstein New Europe Fund for Millennium using nine accounts.

      u.      Between February 10 and February 25, 2003, Ginder's team bought more than $9 million of several Fidelity funds for Millennium using eleven accounts.

      v.      On February 14, 2003, Ginder's team bought $13.2 million of the Goldman Sachs International Fund for Millennium using fifteen accounts and five FA numbers.

      w.      On April 16, 2003, O'Meally's team bought nearly $3 million of the Pimco High Yield Fund for Canary using ten accounts.  The same day, they also bought nearly $3 million of the Pioneer High Yield Fund for Canary using nine accounts.

      37.      The defendants and their team regularly used multiple accounts and FA numbers to exchange large amounts of fund shares within the same fund complex on the same day.  On nearly every occasion, as noted above, all of the customer's exchanges reflected the same investment decision (*i.e.*, a transfer from a money market fund to an equity fund in a particular sector, or vice versa).

**The Defendants' Use of Multiple Accounts and FA Numbers
to Continue Market Timing after Being Blocked**

      38.      Despite the defendants' efforts to avoid detection, some fund companies did manage to determine that certain accounts and brokers were engaged in market timing.  When that happened, the fund company typically sent a letter or email to PSI indicating that an account (usually identified by account number) or broker (usually identified by name and/or FA number) was blocked from further trading in its funds.  Some of these fund company communications (often called "block letters") were sent directly to the broker in question, but most were sent to

PSI's Mutual Fund Operations ("MFO") unit in New York, which typically forwarded copies to the branch manager and/or the broker.

39.     On many occasions, the fund company asked PSI for assistance in preventing an account or broker from continuing to trade in its funds.  In April 2001, responding to the large number of such requests, especially concerning the defendants and certain brokers in PSI's Boston branch office, the MFO unit implemented a computerized system designed to prevent the entry of a transaction into the BOSS 3000 or, in O'Meally's case, the LIST system for an account or FA number that had been blocked by a particular fund company.  The defendants and their teams routinely tracked the block letters from the fund companies and the internal blocks by the MFO in order to know which accounts and FA numbers could not be used for a particular transaction.

40.     The defendants often responded to the block letters by opening new accounts and obtaining new FA numbers.  They sometimes opened as many as eighteen new accounts for the same customer at the same time.  Often, the new accounts began trading using a new FA number.  Dozens of examples are set forth in the company-by-company chronologies in Exhibits J-L.  These include, without limitation, the following:

        a.      On May 8, 2001, Ginder's team opened six new accounts for Brandywine.  The first purchases for these accounts were made using an "also" FA number for Ginder that had been issued on April 6.  (During the prior two months, Brandywine accounts had been blocked by several fund companies, including AIM, Blackrock, and Phoenix.)

        b.      On August 8, 2001, O'Meally's team opened eleven new accounts for Heuristic.  The first purchases for these accounts were made using an "also" FA number for

18

O'Meally that had been issued on August 7.  On September 6, O'Meally's team opened five more new accounts for Heuristic.  The first purchases for these accounts were made using an "also" FA number for a Garden City broker that had been issued on September 5.  (During the prior two months, Heuristic accounts had been blocked by numerous fund companies, including Federated, Franklin Templeton, Goldman Sachs, Oppenheimer, Phoenix, Pioneer, Scudder, and Smith Barney.)

        c.     On January 16, 2002, O'Meally's team opened ten new accounts for Heuristic.  On January 23, they opened five more new accounts for Heuristic.  The first purchases for these accounts were made using an "also" FA number that had been issued to O'Meally on December 13, 2001.  (During the prior two months, Heuristic accounts had been blocked by several fund companies, including American Advantage, Liberty, Phoenix, and Scudder, and on January 9, 2002, American Funds had blocked forty-eight Heuristic accounts.)

        d.     On February 19, 2002, Silver's team opened four new accounts for Millennium.  The first purchases for these accounts were made using "also" FA numbers that had been issued to Silver and his partner on December 5, 2001.  (During the prior two months, Millennium accounts had been blocked by several fund companies, including AIM, American Funds, Franklin Templeton, and State Street Research.)

        e.     On February 26, 2002, Ginder's team opened sixteen new accounts for Brandywine.  The first purchases for these accounts were made using the "also" FA number for a broker in the Special Accounts branch who had just agreed to let Ginder's team use his number.

        f.     On March 15, 2002, Ginder's team opened eight new accounts for Millennium.  The first purchases for these accounts were made using the primary FA number for

a junior broker who had recently joined the team.  (During the prior two months, Millennium

accounts had been blocked by several fund companies, including AIM, American Funds, Liberty,

and State Street Research.)

        g.     On May 31, 2002, Ginder's team opened sixteen new accounts for

Brandywine.  The first purchases for these accounts were made using a joint FA number that had

been issued to Ginder and his partner on April 22.  (During the prior two months, Brandywine

accounts had been blocked by several fund companies, including AIM, Liberty, Putnam, and

State Street Research.)

        h.     On July 3, 2002, Silver's team opened three new accounts for Millennium.

The first purchases for these accounts were made using a joint FA number that Silver and his

partner had obtained on July 1.  (During the prior three months, Millennium accounts had been

blocked by several fund companies, including AIM, Franklin Templeton, and Putnam.)

        i.     On December 20, 2002, O'Meally's team opened eighteen new accounts

for Heuristic.  The first purchases for these accounts were made in January 2003 using an "also"

FA number that had just been issued to O'Meally.  (During the prior two months, Heuristic

accounts had been blocked by numerous fund companies, including American Funds, Eaton

Vance, Goldman Sachs, Janus, T. Rowe Price, and Van Kampen, and just days earlier, Liberty

had blocked eight Heuristic accounts.)

    41.     After a fund company blocked certain accounts or FA numbers, the defendants

often used their inventory of as-yet unblocked accounts and FA numbers to continue submitting

transactions to the same fund company.  On many occasions, this subterfuge worked, as the fund

company was fooled into processing additional transactions from customers and brokers whose

trading it wanted to reject.  Dozens of examples are set forth in the company-by-company chronologies in Exhibits J-L.  These include, without limitation, the following:

a.      On June 7, 2001, Hartford blocked one of Silver's accounts for Millennium.  On June 8, Silver's team sold nearly $1 million of a Hartford fund from the blocked account.  On October 3, they bought $1.5 million of two Hartford funds for Millennium using two unblocked accounts.

b.      On June 19, 2001, Franklin Templeton blocked twenty-five of O'Meally's accounts for Heuristic.  On June 20 and June 21, O'Meally's team sold more than $3.8 million of a Franklin Templeton fund from the blocked accounts.  On August 31, they bought $950,000 of another Franklin Templeton fund for Heuristic using four unblocked accounts.  On October 1, they bought $600,000 of the same Franklin Templeton fund for Heuristic using three more unblocked accounts.

c.      On July 20, 2001, State Street Research blocked four of Ginder's accounts for Brandywine.  On July 25 and August 1, Ginder's team sold more than $800,000 of a State Street Research fund from the blocked accounts.  On August 2 and August 3, they bought nearly $550,000 of another State Street Research fund for Brandywine using two unblocked accounts.

d.      On November 1, 2001, Janus blocked seven of O'Meally's accounts for Heuristic.  On November 8, O'Meally's team sold $1.7 million of several Janus funds from the blocked accounts.  On November 16, they bought $500,000 of a Janus fund for Heuristic using six unblocked accounts.

e.      On November 14, 2001, American Advantage blocked six of O'Meally's accounts for Heuristic.  The next day, O'Meally's team sold more than $620,000 of two

American Advantage funds from the blocked accounts.  Between February 7 and February 12, 2002, they bought more than $1 million of two other American Advantage funds for Heuristic using six unblocked accounts.

      f.     On November 30, 2001, Pioneer blocked three of Silver's accounts for Millennium.  On January 11, 2002, Silver's team bought $900,000 of a Pioneer fund for Millennium using an unblocked account.

      g.     On December 7, 2001, State Street Research blocked seven of Ginder's accounts for Millennium and seven of Silver's accounts for Millennium from its International Fund.  On December 14, Ginder's team bought nearly $1.8 million of the International Fund for Millennium using four unblocked accounts, and Silver's team bought $1.6 million of the same fund for Millennium using four unblocked accounts.

      h.     On January 8, 2002, Liberty blocked eight of O'Meally's accounts for Heuristic.  Between January 8 and January 18, O'Meally's team sold more than $1.3 million of several Liberty funds from the blocked accounts.  Between February 7 and February 12, they bought $1.1 million of two Liberty funds for Heuristic using six unblocked accounts.

      i.     On January 9, 2002, American Funds blocked forty-eight of O'Meally's accounts for Heuristic as well as twelve of his team's FA numbers.  On January 18, O'Meally's team sold more than $1.1 million of an American Funds fund from the blocked accounts.  Between March 15 and May 16, they bought $1.3 million of several American Funds funds for Heuristic using nine unblocked accounts and three unblocked FA numbers.

      j.     On January 9, 2002, American Funds blocked ten of Silver's accounts for Millennium as well sixteen of his team's FA numbers.  On March 15, Silver's team bought

more than $4 million of several American Funds funds for Millennium using four unblocked accounts and two unblocked FA numbers.

k.      On January 11, 2002, Lord Abbett blocked four of Ginder's accounts for Millennium.  The same day, Ginder's team sold nearly $1.3 million of a Lord Abbett fund from the blocked accounts.  On April 10 and April 12, they bought $620,000 of another Lord Abbett fund for Millennium using two unblocked accounts based in a different branch.

l.      On February 20, 2002, American Century blocked thirty of O'Meally's accounts for Heuristic.  Between February 20 and March 19, O'Meally's team sold nearly $4.5 million of American Century funds from the blocked accounts.  On April 12, they bought $825,000 of an American Century fund for Heuristic using three unblocked accounts.  Between May 28 and May 30, they bought $1.1 million of the same fund for Heuristic using nine more unblocked accounts.

m.      On April 9, 2002, Federated blocked six of O'Meally's accounts for Heuristic.  The same day, O'Meally's team sold $943,000 of Federated funds from the blocked accounts and bought $1 million of a Federated fund for Heuristic using an unblocked account. On May 23, they bought $1 million of another Federated fund for Heuristic using two more unblocked accounts.

n.      On April 11, 2002, Putnam blocked forty-two of Ginder's accounts for Brandywine.  On April 17 and April 22, Ginder's team sold more than $10.7 million of two Putnam funds from the blocked accounts.  On June 12 and June 17, they bought $2.85 million of one of the same Putnam funds for Brandywine using five unblocked accounts.

     o.     On May 9, 2002, Dreyfus blocked seven FA numbers used by Ginder's team. On May 9 and May 10, Ginder's team sold $19.5 million of a Dreyfus fund from fourteen Brandywine accounts with blocked FA numbers.  Between June 17 and June 27, they bought nearly $4.7 million of another Dreyfus fund for Brandywine using five accounts with an unblocked FA number.

     p.     On May 16, 2002, Credit Suisse blocked one FA number used by Ginder's team.  On May 20, Ginder's team sold nearly $1.9 million of several Credit Suisse funds from two Millennium accounts with the blocked FA number.  On May 23, they bought $1.45 million of several Credit Suisse funds using a Millennium account with an unblocked FA number.

     q.     On May 24, 2002, AIM blocked six of Ginder's accounts for Brandywine, all of which had the same FA number.  On May 31, Ginder's team sold more than $5.9 million of an AIM fund from the blocked accounts.  On June 17, they bought $3 million of the same AIM fund for Brandywine using two unblocked accounts with a different FA number.

     r.     On May 28, 2002, Fidelity blocked Silver and all his FA numbers, and PSI then imposed an internal block on twenty FA numbers used by Silver's team.  On November 27, Silver's team bought nearly $1.4 million of two Fidelity funds for Haidar using an unblocked FA number.

     s.     On July 17, 2002, Pimco blocked five of Ginder's accounts for Brandywine, all of which had the same FA number.  On July 24 and July 29, Ginder's team bought nearly $1.2 million of a Pimco fund for Brandywine using three unblocked accounts with two different FA numbers.

     t.     On September 26, 2002, Seligman blocked three of Silver's accounts for Millennium as well as eight of his team's FA numbers.  On December 2, Silver's team bought $600,000 of a Seligman fund for Millennium using an unblocked account with an unblocked FA number.

     u.     On October 24, 2002, Scudder blocked one of Silver's accounts for Millennium.  The same day, Silver's team sold more than $2 million of two Scudder funds from the blocked account.  On November 15, 2002, they bought $1.85 million of another Scudder fund for Millennium using two unblocked accounts.

     v.     On November 7, 2002, ING blocked one FA number used by Silver's team plus all related FA numbers, and PSI then imposed an internal block on four FA numbers used by Silver's team.  On November 14, Silver's team bought $535,000 of an ING fund for Haidar using an unblocked FA number.  On November 15, they bought $950,000 of the same fund for Millennium using another unblocked FA number.

     w.     On November 13, 2002, Janus blocked eight FA numbers used by O'Meally's team.  On November 20, Janus blocked three more of the team's FA numbers.  On January 23, 2003, O'Meally's team bought $1.2 million of a Janus fund for Atlantique using five accounts with an unblocked FA number.

     x.     On December 26, 2002, Pimco blocked eighteen FA numbers used by O'Meally's team.  On January 6, 2003, O'Meally's team bought $250,000 of a Pimco fund for Heuristic using two accounts with an unblocked FA number.

       y.      On January 10, 2003, Janus blocked nine of Ginder's accounts for Millennium.  Between February 3 and February 14, Ginder's team bought nearly $8.4 million of a Janus fund for Millennium using ten unblocked accounts.

       z.      On April 1, 2003, Goldman Sachs told PSI that it wanted no more business from O'Meally, and PSI then imposed an internal block on twenty-two of his team's FA numbers.  On June 6, O'Meally's team bought more than $1.7 million of a Goldman Sachs fund for Samaritan using four accounts with an unblocked FA number.

       aa.      On June 19, 2003, AIM blocked seventeen FA numbers used by O'Meally's team.  On June 26 and July 1, O'Meally's team sold more than $2.5 million of an AIM fund from thirty Atlantique accounts that had used the blocked FA numbers.  On August 19 and August 20, they bought more than $550,000 of two AIM funds for Atlantique using seven accounts with two unblocked FA numbers.

      42.      Opening dozens of separate accounts for the same customers, using numerous FA numbers to submit transactions for those accounts, and tracking the holdings in each account imposed a significant administrative burden and generated mountains of paperwork for the defendants and their teams.  Email communications involving the defendants, their teams, and their customers confirm that the multiple accounts and FA numbers were being used to avoid detection and, if detected, to continue market timing.  Examples include, without limitation, the following:

       a.      On March 13, 2001, Silver told a customer that he was transferring certain holdings to a different account:  "This will buy us extra time to trade at Pilgrim – I don't know how long, but it will help!"

b.      On March 28, 2001, Silver gave Peconic some advice about how to continue trading in Alliance and Seligman funds:

> Alliance has flagged us for using the International Funds.  It was a widespread "clean-up" on their part.  It will not affect the Domestic trading that we do at Alliance.  We have two choices here.  One is to use those funds allocated for International funds and trade Domestics. The other idea is to journal about $1,000,000 to a new account number and trade the Internationals again.

> As you already know, Seligman is limiting the exchanges we do.  If it gets to a point where we need to start fresh with them, we'll just journal the position to a new account number.

c.      On May 14, 2001, Johnson asked a member of O'Meally's team to determine which accounts were safe to use for certain funds:  "[T]he actual purchases within those accounts can be made at your discretion based on whether any of the accounts already trade the position or if you want to split the total dollar amount among a few accounts."

d.      On May 16, 2001, Silver advised Peconic to split up its transactions: "[Y]our last trades were for almost 500m [$500,000] each.  Let's use two funds per account for 250m [$250,000] each to hide better!"

e.      On June 5, 2001, a member of Ginder's team explained to Millennium that using "confidential" accounts would help to avoid detection:

> This will allow us to create confidential account numbers so the mutual fund companies cannot see who is buying their funds.  It appears that Calvert stopped our initial exchange due to the fact they identified Wyatt, Atwood & Co. [one of Millennium's shell entities] as market timers at other firms.  Hopefully, by converting your existing accounts to Confidential this may prevent a similar situation with other fund families.

     f.     On June 18, 2001, Heuristic told a member of O'Meally's team that certain transactions should be kept under a threshold amount: "Please allocate among a number of accounts within entities, capping at 200K per fund per account."

     g.     On June 27, 2001, a member of Ginder's team told Brandywine that they would need to use different FA numbers and smaller transactions in order to keep trading in Oppenheimer funds:

> They are definitely cracking down with market timing. No more timing in your existing accounts in rep #'s 022 and 038. When we open new accounts in a new rep # and if we keep trades under $150,000.00, and exchange only in their larger funds we may go undetected.

     h.     On July 17, 2001, a member of Ginder's team told a customer that Ginder recommended keeping each purchase of Seligman funds under $150,000 and each purchase of Pilgrim funds under $500,000.

     i.     On July 26, 2001, a team member told Silver about her advice that Granite keep its trades in Liberty funds below $250,000: "I spoke to Nikki – mentioned that Liberty may be tracking trades at $250,000 and higher – I recommended that she keep the trades smaller. She said she will keep them under $200,000 to start."

     j.     On September 7, 2001, a member of Ginder's team sent Brandywine a list of accounts that might be safe for Pilgrim and Seligman funds:

> At Jason Ginder's request I am forwarding information on accounts that can still buy Pilgrim and Seligman funds. According to my records ... you have not owned Pilgrim and Seligman in the following accounts. You may want to cross reference with your records if available to make sure we are not buying the same funds in the same accounts that you have already been kicked out of.

k.      On September 18, 2001, a member of Ginder's team sent Brandywine some additional suggestions for transactions that might not get caught:

> I have enclosed my excel sheet that I update when we get kicked out of funds. If we need to we can journal additional funds to the #4 accounts that we opened in '97 and purchase funds that we were kicked out of in the 1, 2, 3 accounts. I would stay away from Evergreen, Delaware, Goldman and John Hancock funds, these fund families tend to be very tough lately. Jason believes he may have a little more room with Seligman in particular in the SHGTX (global technology) but must keep orders in the $200,000.00 range.

l.      On September 28, 2001, a member of Ginder's team advised Millennium to buy $350,000 of a Blackrock fund using certain new accounts with a new FA number: "We have not bought this fund in any of the two new accounts in rep [FA number] 026."

m.      On October 22, 2001, Silver advised Haidar to slow down its trading in Putnam funds: "I just wanted to ask you to slow down your trading at Putnam for the next few weeks to extend our time there. We have been warned lately and I want to avoid getting kicked out."

n.      On October 26, 2001, Johnson asked a member of O'Meally's team to determine which accounts were safe to use for certain funds:

> Please see the attached spreadsheet below and carefully review to confirm the following: 1) the suggested replacements I selected are able to trade in the specified accounts, 2) if acceptable, confirm the entry funds and money market symbols that will be used, 3) if the account I selected can not be used for the target fund, assess whether another account in the same facility ... can trade it via transferring the corresponding dollars.

o.      On November 5, 2001, Heuristic suggested to a member of O'Meally's team that using accounts in the Garden City branch might reduce the chance of being blocked: "On the allocations I just sent you pls [please] be sensitive of where they go, i.e. maybe use

Garden City etc.  I am trying diff[erent] ways to reduce k/os ["kick-outs"] and I don't think Garden City has all that much right now?  Haven't we reduced over time?"

        p.      On December 5, 2001, Millennium asked a member of Ginder's team to open new accounts with a particular FA number:  "Let's open the new accounts in the same rep #26.  We'll try to get a little more out of it before we go to a new number."

        q.      On December 26, 2001, a member of O'Mealy's team told Heuristic about the risks of a proposed investment in Seligman funds:  "The only thing is that we might get caught.  I will look at it and see if we could split it up among other accounts."

        r.      On January 2, 2002, a member of Silver's team told Millennium that they have "a trading/purchasing strategy that may keep us under the radar" with Eaton Vance funds.

        s.      On February 1, 2002, Corbett told Johnson that they might need to transfer certain holdings to accounts that had not been blocked:

> We may have to move the available cash from 0SZ-96203 into 0SZ-96204 to purchase the Amer Century Heritage TWHIX, because we are trading Amer Cent Intl in 0SZ-96203.  As for the Alliance offshore, I have to check to see if Alliance European is a "high risk fund".  I think we traded it once and got kicked out after 2 trades.

        t.      On February 11, 2002, a member of O'Mealy's team apologized to a MFO employee for some confusion about which FA numbers were being used for which accounts:  "[W]e have been opening so many new accounts I can't keep up with the also #'s."

        u.      On April 9, 2002, a member of Silver's team told Peconic about their plans for a recent purchase of Touchstone funds:  "After the trades settle, we will split them up in thirds into 3 different accounts."

v.     On April 19, 2002, a member of Ginder's team told Millennium that Pilgrim had blocked only one of their FA numbers: "[T]he only rep number that we have been completely flagged in is 54, these are your accounts in BNG 54.  You may still trade Pilgrim in your other accounts that you have not been kicked out of."

w.     On April 29, 2002, Heuristic raised concerns to O'Meally about the number of blocked transactions:

> We originally talked about going in 1 mill each into funds which were recommended by you for capacity.  We have been k/od [kicked out] out of 30% after 1 round trip.  I am supposed to increase this to 10 mill but can't recommend to do so until I get a little more comfortable with the capacity issues.  Perhaps we are going in on too big of lots?  Maybe decrease our lot size?

x.     On May 15, 2002, a member of Ginder's team told Millennium about a switch in the FA numbers used for certain accounts:

> All these accounts effective tomorrow with the exception of Gilmore #1 (which is being moved to rep #029) are being moved to Rep #027, per management, which is Jason Ginder only.  Please change the rep #s effective tomorrow on your trade sheets.

y.     On May 16, 2002, a Heuristic employee told others at the firm that Corbett had suggested rotating their transactions between accounts with O'Meally's FA numbers and accounts with another broker's FA number: "The way he wants this to work is hitting a fund every 4th trade.  Trade 1 and 3 is O'Meally and 2 and 4 is [the other broker]."

z.     On May 21, 2002, Silver told a team member about his advice to Millennium concerning a warning from Pimco funds: "I told him to consider transferring the position to avoid getting kicked out."

aa.     On June 19, 2002, a Heuristic employee told others at the firm about the benefits of O'Meally's switch from the Liberty Plaza branch to the Garden City branch: "This move should actually help us in that we will trade under new broker numbers, new account numbers, etc and may temporarily delay kickouts."

bb.     On July 10, 2002, a Heuristic employee told others at the firm about the use of new accounts and new FA numbers for a recent large investment: "It required us to open many new accounts (20) and set up 4 new broker ID's. We set up all of these accounts and broker numbers to reduce the likelihood of being picked up as quickly by the mutual funds."

cc.     On October 7, 2002, a member of O'Meally's team gave Corbett his recommendation for trading in AIM funds without detection: "Please look this over, if you see anything wrong please tell me. AIM allows trading under 100k in the accounts, so I figure just put in 100k into every account."

dd.     On October 22, 2002, Johnson told Corbett that it did not matter which Samaritan account was used for a particular transaction: "I don't have a preference regarding which Samaritan account is used for a particular fund, I just need to ensure that the idle cash in each is fully utilized."

ee.     On December 9, 2002, a team member gave Silver an update about blocks by ING:

> The following FA#s will be blocked: 25, 39, 49, L8... I looked through the accounts and nobody currently owns their funds in those FA #s. Although, Haidar's accounts Wessex and Hudson have both owned them in the past. I should probably call them and take them off any lists for future buys ... right? Richard Lewis and Jarko [two Millennium accounts] hold High Yield fund but these accounts were not affected (K4 and R3).

32

ff.      On January 9, 2003, Corbett told a member of O'Meally's team to break up a $200,000 purchase into smaller parts: "Break this trade into $50K increments. Don't forget."

gg.      On January 10, 2003, a member of O'Meally's team gave instructions for the proper handling of certain transactions in Liberty funds: "We should only trade one fund per exchange. Also please make sure we are not trading over 100k at any one time. If we need to, we will transfer $ around to lower the amount exchanged."

hh.      On February 26, 2003, a member of Ginder's team reminded Millennium to submit the letter of attestation needed to open a "confidential" account:

> I noticed that you did not return the Letter of Attestation, which allows us to take the name off the account. Without the letter of attestation the mutual fund families will be able to see the name of the entity doing the business. This could work against us.

ii.      In a telephone conversation in August 2003, Corbett explained to employees of a bank which funded investments by Samaritan that proposed to open certain new accounts under a new FA number:

> They [Samaritan] have like ten accounts open for the longest time with us. It was actually like a total of fourteen or sixteen that they opened with us ... and we played every trick we could and ... what happened to us is we got stopped out of a lot of funds. So in an attempt to get back into the game ... we talked about opening new accounts ....
>
> [W]e're going to put them in a new also number, which doesn't mean anything on your end because you guys are still going to look at the accounts the way you've always looked at the accounts .. . The fund families look at the account s like all new entities, and in order for us to put them in these new also numbers we have to say it's a new client.

43.   Just as the defendants intended, the use of multiple accounts made it more difficult for the fund companies to detect and stop their market timing, for several reasons. First,

the sheer number of accounts disguised the fact that many accounts belonged to the same customer and pursued the same investment strategy.  Second, many accounts were opened with the misleading names of shell entities or as "confidential" accounts without any name at all. Third, the account numbers used more than one identifying prefix for each branch.  Fourth, dividing a customer's transactions into smaller dollar amounts increased the chance of staying "under the radar".  Lastly, as shown above, when a fund company blocked some of a customer's accounts, the defendants could transfer funds to the customer's un-blocked accounts or open new accounts and thus continue trading in the same company's funds despite the blocks.  As a result, the use of multiple accounts frequently deceived the fund companies into accepting transactions from customers whose trading they wanted to block.

44.     Likewise, the use of multiple FA numbers made it more difficult for the fund companies to detect and stop the defendants' market timing, for several reasons.  First, the multiplicity of FA numbers disguised the fact that certain transactions were actually being submitted by the same broker or team of brokers.  Second, the confusion was compounded by the multiple branch prefixes, as each broker's FA number could appear in NSCC transactions with several different prefixes.  Third, many of the FA numbers belonged not to the defendants, but to brokers in the same branch or even a different branch, thus providing the fund companies with many more FA numbers and broker names to track.  Fourth, the trade information submitted through NSCC often failed to include any broker name at all.  Lastly, as shown above, when a fund company blocked certain FA numbers, the defendants could simply start submitting transactions using their inventory of un-blocked numbers.  As a result, the use of multiple FA

34

numbers frequently deceived the fund companies into accepting transactions from brokers whose

trading they wanted to block.

     45.    Letters and emails from the fund companies to PSI reveal the difficulty of

detecting the defendants' market timing, as well as the fund companies' frustration at being

unable to prevent the defendants from using additional accounts and FA numbers to continue

market timing even after being blocked.  Examples include, without limitation, the following:

     a.    On October 19, 2001, Deutsche Asset Management asked PSI to block a

list of accounts that included accounts for customers of O'Meally and Ginder:  "We have

repeatedly called and sent letters to these ... reps requesting them to discontinue timing our funds

to no avail.  This is our last resort.  Thank you for your assistance in this matter."

     b.    On December 4, 2001, Pimco told PSI that it was blocking four accounts

and two FA numbers from the Special Accounts branch, and it threatened to block all further

transactions from the branch:

> In addition, (because of the limited resources available to PIMCO and
> the time we have already taken to work with Prudential on ceasing
> market timing activities) ANY future transactions from this branch
> (regardless of the representative) that PIMCO deems to be detrimental
> to the Fund(s) or our Shareholders will be rejected without further
> notice from PIMCO.

     c.    On January 9, 2002, American Funds told PSI that it would reject all

future transactions from certain brokers, including O'Meally, Silver, and one broker on each of

their teams:

> [American Funds] does not wish to receive any investments from the
> representatives listed below.  These representatives have continued to
> bring us timed accounts, despite being informed by us (sometimes
> repeatedly) not to do such.

d.      On February 20, 2002, American Century asked PSI for help in stopping

market timing by numerous accounts with 0EN, 0SZ and 0YH prefixes (accounts handled by

O'Meally's team):

> Per our conversation, we need your help again in banning these
> firms/clients/reps/bin #s from doing business with American Century
> through Prudential, due to their harmful short-term trading.  A lot of
> these we have seen before, and we don't want  to see them again....
> The attached file shows activity just for the 1st two weeks of February.
> Since you have the ability to "ban" from trading our funds, we want
> this done immediately.  We don't want to see new bin #s [accounts]
> opened up for these investors, we want them stopped for good.

e.      On February 25, 2002, Franklin Templeton complained to PSI that

"Michael Silver and [his partner] have not been shut down as they continue to open timing

accounts."

f.      On April 10, 2002, Goldman Sachs asked PSI to block further trading by

Ginder (under one FA number) and by Silver's partner (under two FA numbers):  "I understand

that rep numbers may change and that this means these brokers may 'sneak' back into our funds.

If you need any other information, please let me know."

g.      On April 12, 2002, AIM asked PSI to block a long list of FA numbers,

only some of which could be identified by the broker's name (including Ginder, Silver, and

certain members of their teams):

> I have attached a list of brokers that are doing heavy timing in our
> funds.  I believe that you are already aware of most of them due to
> previous information that has been sent to you.  There are three
> representatives [including two FA numbers used by Ginder and a
> member of his team] we have added today after researching their
> activity with us.  They are at the bottom of the list.  We do not have
> names for these brokers, so it is possible they are the same people as
> some of the other broker identifications on the list.  We will be placing
> stops today on all accounts identified with the dealer/branch/

representative numbers that are on the attached spreadsheet.

       h.      On April 14, 2002, Franklin Templeton complained to PSI that certain

brokers, including O'Meally and Silver, "appear to have created new rep codes." Two days later,

the firm warned that blocking specific accounts would not be enough to prevent O'Meally from

market timing:

> Providing account numbers won't solve the problem. We need his
> business shut off at the REP LEVEL. We don't want any business
> from him regardless of the account. Also, a stern warning from your
> department would also be appreciated. Let him know that even if he
> then sets up another rep number (which apparently he has), he'll be
> eventually found again and will be stopped again.

       i.      On June 7, 2002, Hartford asked PSI for help in blocking numerous

brokers, including O'Meally, Ginder, Silver, and several members of their teams:

> Unfortunately, they have continued to invest in the Funds even after
> having their privileges revoked. They are apparently accomplishing
> this by using different representative numbers, names, branches and
> smaller investment amounts.

       j.      On August 26, 2002, American Century complained to PSI that it had

blocked O'Meally from all its funds on July 29, but "he again has opened four new accounts

under Branch 0AA using rep #0F6 and under 0SU using rep #0H8." The firm also asked for help

in blocking Silver and his partner, because they too had evaded blocks by submitting trades

through a different branch:

> Please ban Mr. Silver [and his partner] by name and under ALL rep
> numbers. They were trading under a different branch in June and we
> banned them at that time. It looks like they are coming back into our
> funds, once again, with short term trading activity.

       k.      On September 17, 2002, Hartford told PSI that it had blocked certain

trades which O'Meally had submitted under five different FA numbers. The firm also

complained: "We are still having some problems with a couple of reps trying to enter into our

funds after we have revoked their privileges."

        l.    On November 22, 2002, Hartford again complained to PSI that certain

brokers, including Ginder and Silver, were evading previous blocks:

> Unfortunately, they have continued to invest in the Funds even after
> having their privileges revoked.  They are apparently accomplishing
> this by using different representative numbers, names, branches and
> smaller investment amounts.

        m.    On December 19, 2002, Van Kampen complained to PSI about extensive

market timing by O'Meally and by certain brokers in Boston:

> I have spoken to these reps a few times over the past several months
> about stopping their timing activity to no avail.  Over the past several
> months, we have placed stops on 325 of their accounts as of 11/30/02
> and continue to add accounts daily.  We see new accounts/rep ID
> combinations being opened and have determined that we are not able
> to continue chasing them within our funds.  We feel our only course of
> action to protect our fund shareholders is to prohibit the attached listed
> of reps from doing business with Van Kampen Funds.
>
> For the period of December 2001-November 2002 in the Van Kampen
> Funds, this group represents $44 million in sales, $12 million in
> redemptions, $2 billion in exchanges and $40 million in current assets.

        n.    On January 7, 2003, American Funds told PSI that it would reject all

future trades from certain brokers, including Ginder, and it asked PSI to prevent them from

submitting trades using the FA numbers of other brokers:

> We ask that effective immediately the following reps be restricted
> from their ability to place orders to purchase American Funds shares.
> If they want to place a trade to redeem that is fine.  Also, if possible,
> please restrict their clients so they can't go to another rep in the office
> and have that rep purchase trades on the clients' behalf.

o.    On February 20, 2003, Liberty told PSI that it was blocking two more of

O'Meally's FA numbers: "We placed a rep block on Fred O'Meally on January 31st, 2003. He

has since been market timing under the following rep ID's – 0AA0F9 and 0AA0G8."

p.    On March 3, 2003, Goldman Sachs told PSI that it was blocking certain

brokers, including O'Meally and Ginder, under certain FA numbers, and it asked PSI to block all

their other FA numbers, including the FA numbers used by members of their teams:

> If these brokers have additional rep numbers that are not stated above,
> please include those as well.  I know that these brokers are on teams.
> Unfortunately, my list of brokers does not detail the names of team
> members (only the last two digits of their individual numbers).  Is there
> any way you can find out what teams they are a part of?  If so, I'd like
> the teams banned as well.  Even if a team consists of one of the brokers
> above and a broker who is not listed above, ban that too.

q.    On June 19, 2003, AIM told PSI that it was blocking certain FA numbers

(including seventeen used by O'Meally's team):

> Ira asked me to send you an FYI on these brokers/accounts we are
> stopping for excessive activity.  In most cases, they were moving
> dollars below what would normally hit our radar, but someone in our
> sales reporting area noticed the overall impact.  Total dollars impacted
> is nearly $17 million.

46.    As set forth above, the defendants made false statements to the mutual fund

companies by using misleading names on the customer accounts.  The defendants made

omissions of material fact by failing to disclose to the fund companies that the numerous

accounts through which they traded actually belonged to the same customers, and that the

numerous FA numbers through which they placed the trades actually belonged to the same teams

of brokers.  The omitted information was material because the fund companies were trying to

prevent excessive trading in their funds.  The defendants engaged in a fraudulent and deceptive

scheme because the use of multiple accounts and FA numbers was designed to – and did – mislead the fund companies into accepting transactions they would not have accepted if they had known the truth – namely, that what appeared to be thousands of separate transactions submitted by numerous brokers for dozens of unrelated customers was actually a systematic pattern of market timing by three teams of brokers for a handful of customers, and, even worse, that the brokers and customers had already been blocked for excessive trading by the same fund companies.

## FIRST CLAIM FOR RELIEF
### (Violations of Section 17(a) of the Securities Act)

47.     The Commission repeats and realleges paragraphs 1 through 45 above.

48.     As set forth above, defendants, directly and indirectly, acting intentionally, knowingly or recklessly, in the offer or sale of securities by the use of the means or instrumentalities of transportation or communication in interstate commerce or by use of the mails:  (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of material fact or omissions to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, acts, practices or courses of business which operated as a fraud or deceit upon purchasers of securities.

49.     As a result, defendants violated Section 17(a) of the Securities Act [15 U.S.C. §77q(a)], and their violations involved fraud, deceit, or deliberate or reckless disregard of regulatory requirements and resulted in substantial losses or significant risk of substantial losses to other persons, within the meaning of Section 20(d) of the Securities Act [15 U.S.C.§77t(d)].

40

## SECOND CLAIM FOR RELIEF
### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5)

50.    The Commission repeats and realleges paragraphs 1 through 48 above.

51.    As set forth above, defendants, directly or indirectly, acting intentionally, knowingly or recklessly, by the use of the means or instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material fact or omitted to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices or courses of business which operated as a fraud or deceit upon certain persons.

52.    As a result, defendants violated Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 [17 C.F.R. §240.10b-5] thereunder, and their violations involved fraud, deceit, or deliberate or reckless disregard of regulatory requirements and resulted in substantial losses or significant risk of substantial losses to other persons, within the meaning of Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court:

A.    Enter a permanent injunction restraining defendants and their respective agents, servants, employees and attorneys and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, including facsimile transmission or overnight delivery service, from directly or indirectly engaging in violations of

Section 17(a) of the Securities Act [15 U.S.C. §77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5];

B.    Order each defendant to disgorge his ill-gotten gains, plus pre-judgment interest;

C.    Order each defendant to pay an appropriate civil penalty pursuant to Section 20(d) of the Securities Act [5 U.S.C. §77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)]; and

D.    Award such other and further relief as the Court deems just and proper.

Respectfully submitted,

Frank C. Huntington / Am V.

Frank C. Huntington (Mass. Bar No. 544045)
   Senior Trial Counsel
Stuart P. Feldman (Mass. Bar No. 559147)
   Branch Chief
Beth Lehman (Mass. Bar No. 652712)
   Senior Enforcement Attorney
Boston District Office
33 Arch Street, 23rd Floor
Boston, MA  02110
(617) 573-8960  (Huntington direct)
(617) 573-4950  (fax)

Alexander M. Vasilescu (AV-2575) (Local Counsel)
   Regional Trial Counsel
Northeast Regional Office
3 World Financial Center, Room 4300
New York, NY  10281
(212) 336-0178  (direct)

Attorneys for Plaintiff
**SECURITIES AND EXCHANGE COMMISSION**

Dated:  August 28, 2006