UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
SECURITIES AND EXCHANGE COMMISSION,

        Plaintiff,

  -v-                                          No.  06 Civ. 6483 (LTS)(RLE)

FREDERICK J. O'MEALLY

        Defendant.
-------------------------------------------------------x

### MEMORANDUM OPINION AND ORDER

This civil enforcement action was commenced by the Securities and Exchange Commission (the "SEC"), pursuant to Section 17(a) of the Securities Act of 1933 ("Securities Act"), 17 U.S.C. § 77q(a), Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, against Frederick J. O'Meally ("Defendant") for securities fraud.  The SEC alleged that the Defendant employed deceptive schemes to conceal from dozens of mutual fund companies the fact that he was engaging in "market timing" practices – defrauding the mutual fund companies and the funds' shareholders.  The Court has jurisdiction of this case pursuant to 17 U.S.C. §§ 77q, 78j, and 28 U.S.C. § 1331.

On December 14, 2011, after a month-long jury trial, the jury rendered a verdict finding the Defendant liable for negligently violating Section 17(a)(2) or (3) of the Securities Act with respect to transactions in shares of mutual funds sponsored by six of the mutual fund companies: American Century, American, Goldman Sachs, Hartford, Pimco and Van Kampen. The SEC now moves for entry of a final judgment of permanent injunction, disgorgement and a civil penalty as to the Defendant.  For the following reasons, the SEC's requests for

disgorgement and the imposition of a civil penalty are granted.

DISCUSSION[1]

Permanent Injunction

Pursuant to Section 20(b) of the Securities Act, the SEC may seek a permanent injunction against a defendant to prevent further violations of the federal securities laws.  15 U.S.C. §77t(b).  The SEC seeks the imposition of a permanent injunction barring Defendant from violating Sections 17(a)(2) or 17(a)(3) of the Securities Act (i.e. from obtaining money or property by means of an untrue statement or omission of material fact or engaging in any transaction, practice, or course of business which operates or would operate as fraud or deceit upon the purchaser).

"An injunction prohibiting a party from violating statutory prohibitions is appropriate where 'there is a likelihood that, unless enjoined, the violations will continue.'" SEC v. First Jersey Securities, Inc., 101 F.3d 1450, 1477 (2d Cir. 1996) (citations omitted).  However, "illegal activity, without more, does not automatically justify the issuance of an injunction."  SEC v. Bausch & Lomb, Inc., 565 F.2d 8, 18 (2d Cir. 1977) (citation omitted).  "Several factors are to [be] considered in determining the probability of future violations: '(1) the degree of scienter involved, (2) the isolated or recurring nature of the fraudulent activity, (3) the defendant's appreciation of his wrongdoing, and (4) the defendant's opportunities to commit future violations.'"  SEC v. Alexander, No. 00 Civ. 7290(LTS)(HBP), 2004 WL 1468528, at *10

---

[1] The facts of this case, familiarity with which is assumed, have been thoroughly discussed in prior opinions and orders issued by this Court, most recently in the Court's May 30, 2012, Memorandum Order denying Defendant's motion for judgment as a matter of law.

(S.D.N.Y. June 28, 2004) (citation omitted).  "[I]t will almost always be necessary for the Commission to demonstrate that the defendant's past sins have been the result of more than negligence. . . . An injunction is a drastic remedy, not a mild prophylactic, and should not be obtained against one acting in good faith."  Aaron v. SEC, 446 U.S. 680, 703 (1980) (C.J. Burger, concurrence).  "Although no single factor is determinative, . . . the degree of scienter 'bears heavily' on the decision."  SEC v. Pros Int'l, Inc., 994 F.2d 767, 769 (S.D.N.Y. 1993) (affirming district court's denial of a permanent injunction because, even though defendant's "actions were clearly negligent and probably reckless, there [was] no showing that [he] intended to defraud investors").

   Here, the jury found that the Defendant did not act with scienter, but that he negligently violated section 17(a)(2) or (3) with respect to trading in six out of sixty mutual fund families.  See Verdict Form (docket entry no. 158) (finding Defendant not liable for knowing or reckless violations of section 10(b), Rule 10(b)-5, sections 17(a)(1), and sections 17(a)(2) and (a)(3) for the rest of the mutual fund families).  The jury's findings that O'Meally did not engage in intentional or reckless illegal conduct weigh against the imposition of injunctive relief.  The relative magnitude of the conduct also weighs against an injunction here – the SEC sought to prove that O'Meally had engaged in intentional or reckless fraudulent conduct with respect to the shares of 60 mutual fund families, but the jury found only negligent conduct, and that with respect to only six of the fund families.  While the negligent conduct clearly was not isolated and was recurring with respect to those six fund families, the record does not reveal it to be so pervasively characteristic of O'Meally's method of doing business as to indicate that he will

continue to violate the securities laws unless an injunction is issued.[2]  O'Meally's statements in connection with this motion practice regarding the wrongfulness of his conduct similarly indicate that an injunction is not necessary to ensure future compliance.  (See O'Meally Decl., Aug. 13, 2012 at ¶ 2) ("I alone am responsible for my conduct and I fully accept that responsibility").  This is not a case in which the defendant "has [ ] continued to maintain that his past conduct was blameless."  SEC v. Stanard, No. 06 Civ. 7736(GEL), 2009 WL 196023, at *33 (S.D.N.Y. Jan. 27, 2009).

The final factor, namely, a defendant's opportunity to commit future wrongdoing, also weighs in Defendant's favor.  The Defendant has submitted a sworn declaration in which he states unequivocally that he does not trade mutual funds.  (O'Meally Decl., Aug. 13, 2012, ¶ 4.)  In his Supplemental Declaration, dated August 31, 2012, Defendant explains that "options, stocks, exchange traded funds and other securities" that he deals with for his hedge fund are not subject to restrictions on trading frequency and have characteristics different from those of mutual funds.  (O'Meally Decl., Aug. 31, 2012, ¶ 2.)  The mere fact that the Defendant is currently the manager of a hedge fund and, as the SEC states, still has an opportunity to violate federal securities laws, is insufficient to warrant the issuance of an injunction.  Pros Int'l, Inc., 994 F.2d at 769 ("the mere fact that the Defendant will remain an accountant is insufficient for an injunction").  Accordingly, upon a weighing of these four factors, the Court finds that the SEC has failed to demonstrate that the issuance of injunctive relief is warranted.

---

[2]  The SEC has submitted a Supplemental Submission in which it argues that criminal tax evasion involving a corporation half-owned by Defendant from 2012 indicates that Defendant's record is not unblemished. (Pl. Suppl. Submission, Dec. 7, 2012, at 2).  The Court does not find the events that gave rise to this tax charge relevant as to whether an injunction should issue.

Disgorgement

The SEC requests that the Court require O'Meally to disgorge $547,200. Disgorgement is a form of equitable relief.  See First Jersey Securities, 101 F.3d at 1474.  "The effective enforcement of the federal securities laws requires that the SEC be able to make violations unprofitable.  The deterrent effect of an SEC enforcement action would be greatly undermined if securities law violators were not required to disgorge illegal profits."  Id. at 1474 (quotations omitted).  When calculating disgorgement, "[t]he SEC must first demonstrate that its calculation of disgorgement reasonably approximates the amount of the defendant's unjust enrichment, after which the burden shifts to the defendant to show that the SEC's calculation was unreasonable, i.e., that he received less than the full amount sought to be disgorged."  SEC v. Razmilovic, 822 F. Supp. 2d 234, 252 (E.D.N.Y. 2011), citing SEC v. Colonial Inv. Management LLC, 659 F. Supp. 2d 467, 501 (S.D.N.Y. 2009), aff'd, 381 F. App'x 27 (2d Cir. 2010).  "Disgorgement need only be a reasonable approximation of profits causally connected to the violation."  SEC v. Patel, 61 F.3d 137, 139 (2d Cir. 1995) (alterations and citations omitted).  "Any risk of uncertainty in calculating disgorgement should fall on the wrongdoer whose illegal conduct created the uncertainty."  Id. at 140 (quotation marks, alterations and citation omitted).  "Finally, financial hardship is not grounds for denying disgorgement."  SEC v. Robinson, No. 00 Civ. 7452(RMB)(AJP), 2002 WL 1552049, at *8 (S.D.N.Y. July 16, 2002).

Defendant testified at trial that his compensation from all market timing during the period from January 2001 until his employment was terminated in September of 2003 was $3.8 million. [Tr. 1675-76.]  The SEC proffers that the portion of that compensation which can reasonably be attributed to trading in the six funds covered by the jury verdict is $547,200.

(Hussein Decl., July 2, 2012, ¶ 6(e).)[3]  The Defendant agrees that the SEC has properly calculated the amount of his purchases ($163 million) for his market timing customers from the six fund companies at issue during the relevant period.  (Def. Mem. in Opp. to Pl. Mot. for Entry of Final Judgment at 18.)  Defendant also agrees that the Commission's estimate of his financial benefit from market timing in the funds of those six companies ($547,200), which works out to a request of $3,350 for every $1 million of alleged negligent purchases, is very close to his own estimate that he received a pre-tax commission of $3,300 for every $1 million of purchases for his market-timing clients.  (Id.)  Defendant asserts, however, that approximately $136,000,000 of the market timing purchases should be excluded from the disgorgement computation for various reasons, as follows.

### $30,556,270 of Purchases Made Using FA Number 0TI-0A7

Defendant first argues that $30,556,270 of purchases made using FA number 0TI-0A7 should be excluded because that FA number was jointly assigned to Defendant and another individual.  Defendant proffers in his sworn declaration that he did not receive any commissions for trades using this number.  (O'Meally Decl., Aug. 13, 2012, ¶ 7(i).)  There was credible testimony at trial that not all joint numbers involved commission splits, and that sometimes one broker would receive nearly all of the commission. [Diconza Tr. 1123-1124.]  In light of the

---

[3]  Ms. Hussein, a Forensic Accountant for the SEC, determined that the total value of the mutual funds shares purchased for Defendant's market timing customers from January 2001 to September 2003 was $1,131,687,077 and calculated that the total value of the mutual fund shares purchased from the six fund companies covered by the jury verdict was $163,027,208.  Purchases from the six fund companies covered by the jury verdict thus represented about 14.4% of mutual fund shares purchased for the market timing customers during that time period, so Ms. Hussein applied that percentage to Defendant's total market timing-related compensation of $3.8 million to obtain the figure of $547,200.

Defendant's sworn testimony that he never received any commissions for trades made under this number and the SEC's failure to proffer any specific evidence of the allocation of commissions to O'Meally for trades using this number, the Court concludes that Defendant has met his burden of showing that including commissions from this FA number in the disgorgement calculation is unreasonable.  As the SEC's disgorgement request works out to $3,350 in disgorgement for every $1 million in purchases, this reduces the Defendant's maximum potential disgorgement obligation by $102,364 ($3,350 multiplied by 30.556270 million in purchases).

### $460,000 of Purchases Made Using FA number 0YH-E6

Defendant also asserts that the Court should exclude $460,000 of purchases made under FA number 0YH-E6 from the computation because that number was not assigned to the Defendant and was not on SEC Trial Exhibit 48, which listed Mr. O'Meally's FA numbers. However, as explained in the SEC's reply papers, the trial record reflects the use of this number for purchases in three accounts belonging to one of Defendant's market-timing customers, Johnson Capital.  All three of these accounts appeared on the list of Johnson Capital Accounts used by Defendant and his team.  Defendant's primary FA number was also used to submit trades for these same accounts.  In light of the evidence proffered by the SEC, the Court finds that inclusion of the $460,000 in purchases for purposes of the disgorgement calculation is reasonable.

### $45,269,803 of Purchases of High Yield Funds Shares

Defendant asks that the Court exclude $45,269,803 of purchases made in nine "high yield" funds offered by four of the fund companies (American, Goldman Sachs, Pimco and Van Kampen).  Defendant argues that these funds should not be included in the disgorgement calculations because transactions in those funds were conducted pursuant to a

a "high yield" strategy that "generally involve[d] four to twelve round trips per year" and "is generally not considered market timing." (O'Meally Decl., Aug. 13, 2012, ¶7(ii).) O'Meally does not, however, specifically deny that he engaged in market timing in these funds, and the SEC identifies evidence in the record showing that American Funds specifically blocked two accounts that had been exchanging in its high yield funds, and all four of the fund companies eventually tried to prohibit trading by the Defendant regardless of the specific funds involved. (Hussein Suppl. Decl., Aug. 24, 2012, ¶ 5); (Pl. Reply Br. at 12, citing to trial transcript). The SEC also proffers evidence that, for at least some of the funds, including American Funds and Van Kampen, there was extensive trading performed in short time periods, including an instance of four Delphi-Canadian Imperial Holdings Inc. accounts exchanging in American Funds high-yield tickers six times in six weeks. (Hussain Suppl. Decl., Aug. 24, 2012, ¶ 6.) In light of this evidence, Defendant has not met his burden of showing that the Court should exclude the $45,269,803 in "high yield" fund purchases from its disgorgement calculation.

### $11,481,728 of Purchases Made Before Receipt of First Block Letter

Defendant further contends that the Court should exclude from its disgorgement calculations $11,481,728 of purchases made before the receipt of the first block letter from five of the fund companies. However, the evidence shows that Defendant was on notice of the market timing restriction prior to the issuance of the letters. Prudential's attorneys told Defendant before January of 2001, not to engage in any market timing activities in the funds of Goldman Sachs and Hartford; Defendant thus did not need to receive block letters from these companies to know that he should not be market timing in their funds. [Tr. 1847-49, 1962-64.] In April of 2000, Pimco told Defendant that his trading was excessive and invited him to take his market timing business elsewhere. [Tr. 629-30.] Van Kampen also told Defendant in 1999 that

it was imposing a limit of eight round trips [Tr. 919-21], and Defendant admitted that Van Kampen had started blocking his market timing activity before 2001. [Tr. 2165]. Accordingly, there was plenty of warning about what was going on before the block letters arrived in 2001. Defendant has not met his burden of demonstrating that the Court should exclude the $11,481,728 of purchases allegedly made before the receipt of a block letter.

$56,845,348 of Purchases Allegedly Made in Compliance with Prudential Policy

Defendant also asks the Court to exclude $56,845,348 of purchases that the Defendant made, which Defendant claims were in compliance with the terms of the fund company block letters and instructions from Defendant's supervisor. Defendant does not proffer any details of the analysis underlying this $56 million figure. Defendant's self-serving testimony is not sufficient to establish that he interpreted the communications in the manner in which they were interpreted by Prudential's Legal and Compliance staff. For these reasons, this $56,845,348 of purchases will not be excluded from the Court's disgorgement analysis.

The Court concludes that $444,836 ($547,200 minus $102,364) constitutes a reasonable approximation of the financial benefit that O'Meally derived from his illegal market timing transactions. O'Meally will therefore be required to disgorge $444, 836.

Prejudgment Interest

A court has "broad discretion" to order a defendant to pay prejudgment interest on the disgorgement amount. First Jersey, 101 F.3d at 1476 (citation omitted). "Requiring the payment of interest [on disgorgement] prevents a defendant from obtaining the benefit of 'what amounts to an interest-free loan procured as a result of the illegal activity.'" SEC v. Credit Bancorp Ltd., No. 99 Civ. 11395(RWS), 2011 WL 666158, at *3 (S.D.N.Y. Feb 14, 2011) (citation omitted). "In deciding whether an award of prejudgment interest is warranted, a court

should consider '(i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved and/or (iv) such other general principles as are deemed relevant by the court.'" First Jersey, 101 F.3d at 1476.  The Second Circuit has approved the use of IRS underpayment rates in such calculations, as "[t]hat rate reflects what it would have cost to borrow the money from the government and therefore reasonably approximates one of the benefits the defendant derived from its fraud."  Id.

Here, the SEC offered testimony at trial from fund company witnesses about how the Defendant's practice of market timing harmed the funds and the funds' shareholders by interfering with the fund's portfolio management and creating extra transaction costs for a fund's long-term shareholders.  See, e.g., American Funds [Tr. 327-30]; Goldman Sachs [Tr. 786]; Van Kampen [Tr. 435-36].  Defendant himself admitted that he knew that some fund companies believed that excessive trading caused these types of harm.  [Tr. 1698].

The securities laws indisputably have a remedial purpose and there is a strong public policy underlying an award of prejudgment interest, as it "serves the important purpose of deterrence, which is central to securities law."  SEC v. Sheyn, No. 04 Civ. 2003(LAP), 2010 WL 3290977, at *7 (S.D.N.Y. Aug. 9, 2010).  Defendant has also enjoyed the benefits of his wrongdoing, namely, his compensation from negligently violating the securities laws with regards to these six mutual funds.  The Court finds that an award of prejudgment interest from October 1, 2003 (the first day of the month following the termination of O'Meally's employment with Prudential) is warranted.  The interest will be computed at the IRS underpayment rate.

Civil Penalty

Section 20(d)(2) of the Securities Exchange Act authorizes a court to impose a

civil penalty for certain violations of the federal securities laws. 15 U.S.C. § 77t(d)(2). Congress added the possibility of a civil penalty in order to further the "dual goals of punishment of the individual violator and deterrence of future violations." Official Committee of Unsecured Creditors of WorldCom Inc. v. SEC, 467 F.3d 73, 81 (2d Cir. 2006) (citation omitted) ("disgorgement merely requires the return of wrongfully obtained profits; it does not result in any actual economic penalty or act as a financial disincentive to engage in securities fraud" (citations omitted)). A district court determines the civil penalty "in light of the facts and circumstances of the case" and the civil penalty is never to exceed the "gross amount of pecuniary gain to the defendant as a result of the violation." 15 U.S.C. § 77t(d)(2)(A). "In determining whether civil penalties should be imposed, and the amount of the fine, courts look to a number of factors, including (1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition." SEC v. Milligan, 436 F. App'x 1, 2 (2d Cir. 2011) (quotations and citation omitted). 15 U.S.C. § 77t(d)(2) establishes three tiers of civil penalties.

A first tier penalty of up to the greater of $6,500[4] per violation and the amount of the defendant's gain is appropriate for any securities law violation. 15 U.S.C. § 77t(d)(2)(A); 17 C.F.R. § 201.1003. If the violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement," second tier penalties of up to the greater of

---

[4] The statutory penalty per violation is adjusted periodically for inflation. For violations occurring after February 2, 2001, and before February 14, 2005, the time period at issue here, the first tier figure was $6,500 for each violation. C.F.R. §§ 201.1002, 201.1003.

$60,000 per violation and the amount of the defendant's gain apply.  15 U.S.C. § 77t(d)(2)(B); 17 C.F.R. § 201.1003. If the violation, in addition to second tier factors also "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons," third tier penalties of up to the greater $120,000 per violation and the amount of the defendant's gain are appropriate.  15 U.S.C. § 77t(d)(2)(C)(II); 17 C.F.R. § 201.1003.  The SEC seeks the imposition of a third tier civil penalty in this case.

   Third tier penalties are the most severe, and require proof that the violation involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement, and that such violation 'resulted in substantial losses or created a significant risk of substantial losses to other persons.'"  SEC v. Shainberg, 316 F. App'x 3, n 2 (2d Cir. 2008) (internal citations omitted); see also SEC v. Kern, 425 F.3d 143, 153 (2d Cir 2005) ("assuming without deciding that scienter is necessary to an imposition of Tier III penalties").

   Here, the jury found that Defendant negligently violated the securities laws with respect to some, but not all, of the funds in which he traded for his market timing clients.  The evidence at trial established that market timing presented a significant risk of harm to long-term investors, warranting the imposition of a penalty.  See e.g., SEC v. Gabelli, 653 F.3d 49, 53 (2d Cir. 2011) ("market timing can harm long-term investors in the fund by raising transaction costs for a fund, disrupting the fund's state portfolio management strategy, requiring a fund to maintain an elevated cash position to satisfy redemption requests, resulting in lost opportunity costs and forced liquidations . . .")(internal alterations, quotation marks and citation omitted), rev'd on other grounds ___S.Ct.___, 2013 WL 691002, at *4 (2013).  Defendant's current and future financial situation is not a significant factor in favor of mitigation or elimination of a penalty because, although Defendant does not hold as lucrative a position as he had before, he is

still working and earning substantial compensation as a manager of a hedge fund.

Having considered all of the relevant factors, the Court concludes that the imposition of a civil penalty is warranted but that Defendant's conduct is not egregious enough to warrant a third tier civil penalty.  A first tier civil penalty is appropriate.  15 U.S.C. § 77t(d)(2).  "The tier determines the maximum penalty, with the actual amount of the penalty left up to the discretion of the district court."  U.S. SEC v. Verdiramo, No. 10 Civ. 1888, 2012 WL 5935609, at *5 (S.D.N.Y. Nov. 27, 2012)(internal citation omitted).  Considering the type of conduct at issue, the fact that the jury found that Defendant did not act with scienter, and the evidence Defendant's conduct created the risk of substantial loss to other persons, the Court finds it appropriate that Defendant pay a civil penalty of $60,000.

## CONCLUSION

SEC's motion is granted to the extent that judgment will be entered requiring O'Meally to disgorge $444,836, plus prejudgment interest calculated at the IRS tax underpayment rate, pursuant to 26 U.S.C. § 6621(a)(2), from October 1, 2003, and a additional civil penalty in the amount of $60,000.  The SEC's motion is denied in all other respects.  The Clerk of Court is directed to enter judgment accordingly.  This Memorandum Opinion and Order resolves docket entry number 210.

SO ORDERED.

Dated: New York, New York
       March 11, 2013

/S
LAURA TAYLOR SWAIN
United States District Judge