# UNITED STATES COURT OF APPEALS

## FOR THE SECOND CIRCUIT

August Term, 2013

(Argued: February 7, 2014    Decided: May 19, 2014)

Docket No. 13-1116

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
```

SECURITIES AND EXCHANGE COMMISSION,

<u>Plaintiff-Appellee</u>,

- v.-

JASON N. GINDER, MICHAEL L. SILVER,
BRIAN P. CORBETT,

<u>Defendants</u>,

and

FREDERICK O'MEALLY,

<u>Defendant-Appellant</u>.

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
```

Before:     JACOBS, CALABRESI and POOLER, <u>Circuit Judges</u>.

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #: _____
> DATE FILED: May 19, 2014

CERTIFIED COPY ISSUED ON 05/19/2014

Frederick O'Meally appeals from a judgment of the United States District Court for the Southern District of New York (Swain, J.), finding him in violation of Section 17 of the Securities Act of 1933, 15 U.S.C. § 77q. For the following reasons, we reverse.

>                    ANDREW J. FRISCH (Jeremy B. Sporn and
>                    Amanda L. Bassen, on the brief), The Law
>                    Offices of Andrew J. Frisch, New York,
>                    New York (Jonathan A. Harris, Harris,
>                    O'Brien, St. Laurent & Houghteling LLP,
>                    New York, New York, on the brief), for
>                    Appellant.
>
>                    JEFFREY A. BERGER (Michael A. Conley
>                    and Jacob H. Stillman, on the brief), on
>                    behalf of Anne K. Small, General Counsel,
>                    Securities and Exchange Commission,
>                    Washington, D.C., for Appellee.

DENNIS JACOBS, Circuit Judge:

Frederick O'Meally, a broker, traded on his clients' behalf using a mutual-fund trading strategy known as market timing. While market timing is legal, doing it in a deceptive manner (like anything else in securities trading) is not. And many mutual funds have policies that forbid or discourage it. In this civil enforcement action, the Securities and Exchange Commission ("SEC") alleged deceptive conduct by O'Meally with respect to trading in sixty mutual funds.

Specifically, the complaint alleged that O'Meally failed to follow directives issued by the mutual funds and his employer (Prudential Securities) to cease his market timing, and that he used different "financial advisor numbers" when mutual funds blocked trading from the ones he customarily used. The jury found that O'Meally had engaged in no intentional misconduct; but that O'Meally violated Section 17 of the Securities Act of 1933, 15 U.S.C. § 77q, which has no scienter element, with respect to only six of the sixty mutual funds. On appeal, O'Meally argues that the district court erred by: 1) excluding certain evidence as irrelevant; 2) improperly instructing the jury on a good-faith defense; 3) denying his Rule 50 motion seeking judgment as a matter of law based on insufficiency of evidence; and 4) awarding disgorgement and pre-judgment interest. Because we rule on the ground of insufficiency, the other grounds are referenced only incidentally.

The SEC's trial strategy focused entirely on O'Meally acting intentionally. When the jury rejected all claims of intentional misconduct, the district court sustained the jury's verdict on the theory that O'Meally negligently failed to read and heed instructions from his supervisors; yet other theories are argued on appeal. Because the evidence was insufficient to support a verdict against O'Meally under a theory of negligence, we reverse.

# BACKGROUND

O'Meally was a licensed broker who worked for Prudential Securities from 1994 to 2003. On behalf of his clients--money managers at hedge funds--O'Meally traded shares of mutual funds using market timing, which is a form of arbitrage. It "'exploit[s] brief discrepancies between the stock prices used to calculate [a mutual fund's] shares' value once a day, and the prices at which those stocks are actually trading in the interim.'" SEC v. Ficken, 546 F.3d 45, 48 (1st Cir. 2008) (quoting Kircher v. Putnam Funds Trust, 547 U.S. 633, 637 n.4 (2006)); see also In re Mut. Funds Inv. Litig., 529 F.3d 207, 210-11 (4th Cir. 2008) (defining market timing as "mov[ing] in and out of the funds to take advantage of the temporary differentials between the mutual funds' daily-calculated 'net asset value' ('NAV') and the market price of the component stocks during the course of a day"). Because this strategy entails numerous short-term trades in a fund's shares, it can disadvantage long-term investors by: increasing the fund's transaction costs; impairing the fund's ability to maintain liquidity for share redemptions in the usual course; and limiting the fund's ability to invest in long-term assets. See In re Mut. Funds, 529 F.3d at 211; see also SEC v. Gann, 565 F.3d 932, 935 (5th Cir. 2009).

1    Market timing is not illegal. But mutual funds often endeavor to curb this

2    technique by restricting its use in the trading of their shares. See Gann, 565 F.3d

3    at 934. Many fund prospectuses prohibit market timing, and a number of funds

4    traded by O'Meally sought to halt the practice. Some funds identified

5    transactions associated with O'Meally's financial advisor numbers (hereafter "FA

6    numbers") and proscribed future transactions using those numbers. Those funds

7    sent O'Meally "block notices" to inform him of these restrictions. See id. at 935

8    ("A block notice typically informs the broker that he has run afoul of a fund's

9    restrictions and bars specified accounts controlled by the broker from future

10   trades."). For its part, Prudential supported the funds' efforts with its own policy

11   of compliance with the funds' restrictions.

12   O'Meally persisted in market timing on behalf of his clients over the

13   objections of the funds and Prudential. When the funds blocked accounts

14   associated with O'Meally, he continued to trade in them under new FA numbers

15   and customer account numbers. These practices permitted O'Meally to mask his

16   activity, and helped O'Meally become one of Prudential's top traders. During the

17   relevant period of January 2001 to September 2003, O'Meally earned

18   approximately $3.8 million from market timing transactions done on behalf of his

19   clients.

5

1    The SEC initiated this civil enforcement proceeding against O'Meally and
2    some of his colleagues.  The SEC's complaint alleged that O'Meally violated:
3    Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a); Section 10(b) of the
4    Securities Exchange Act, 15 U.S.C. § 78j(b); and SEC Rule 10b-5, 17 C.F.R. §
5    240.10b-5.  The SEC's strategy at trial undertook to show that O'Meally knew the
6    clear directives of the funds and his employer, and that he intentionally
7    disregarded those directives, and adopted certain practices designed to conceal
8    his role in such trading.
9    O'Meally introduced evidence demonstrating that the policies established
10   by the funds were anything but clear due to their inconsistent application.  For
11   example, PIMCO Funds permitted at least one of O'Meally's clients to engage in
12   market timing notwithstanding the restriction found in its fund prospectus.  In
13   other cases, a fund's salesperson negotiated with Prudential to allow market
14   timing trades without the salesperson notifying the office responsible for
15   enforcing the fund's restrictions.  Some funds, despite expressing concerns about
16   market timing, chose not to terminate trading with Prudential because of the size
17   of its business.  O'Meally also showed that the use of multiple FA numbers had
18   legitimate purposes, such as sharing business-generation credit among brokers or

allowing clients to track their trades without learning of investments by other Prudential clients.

Prudential's internal policy, according to one of its sales associates, was understood to honor a fund's demands only in the narrowest sense: if a block notice referenced a certain account, the notice was read to have no effect as to any other accounts affiliated with the blocked account. Those responsible for overseeing O'Meally's activities at Prudential--his supervisors, the compliance department, and the legal department--approved of his practices. And the firm invested in a computer system capable of processing O'Meally's strategy more efficiently.

O'Meally unsuccessfully tried to proffer evidence that, when the SEC and state attorneys general sued the funds, the settlement agreements recited findings that the funds permitted market timing in their annuity funds. The district court conditionally excluded that evidence as irrelevant, pending O'Meally's showing that the settlement agreements were connected with his own market timing (this proffer is the evidentiary ruling O'Meally has challenged on appeal).

At the close of evidence, O'Meally made a Rule 50 motion for judgment as a matter of law. O'Meally argued that the court should dismiss any claim by the

SEC based on negligence because all of the SEC's evidence undertook to show intentional conduct, and no expert evidence was introduced to show an applicable standard of care. The court reserved decision until after the jury reached a verdict.

During deliberations, the jury sent a note to the court asking: "if good faith defense is found by preponderance of evidence, is that [a] complete defense to [the] SEC charges?" Trial Tr., App. at 509. The Court answered "no" and referred the jury to its initial instructions (this supplemental charge is the one O'Meally has challenged on appeal).

In a verdict delivered the next day, the jury found that O'Meally did not violate Section 10(b) of the Securities Exchange Act or Rule 10b-5. With respect to Section 17(a) of the Securities Act, the jury found that O'Meally was not liable for intentional or reckless conduct with respect to any of the sixty mutual funds referenced in the SEC's complaint. However, the jury found that O'Meally did violate Sections 17(a)(2) and (a)(3) by negligent conduct--though as to only six of the sixty mutual funds.[1]

---

[1] The six funds are American Century Funds, American Funds, Goldman Sachs Funds, Hartford Funds, PIMCO, and Van Kampen Funds.

O'Meally renewed his Rule 50 motion challenging the sufficiency of evidence regarding negligence. The district court surmised that "[t]he jury's verdict . . . might be premised on a finding that O'Meally acted negligently with regard to *either* [i] the specialized and technical aspects of his job or [ii] the common task of reading and heeding emails from a supervisor." Memorandum Order, SEC v. O'Meally, No. 06 Civ. 6483, ECF No. 202 at 6 (S.D.N.Y. May 30, 2012). As to O'Meally's argument that negligence could not be established in this case absent expert testimony regarding the duty of care, the court ruled that the jury could have found O'Meally liable under the second form of negligence, which did not require expert testimony regarding the standard of care. Id. at 6-7. Thus, the verdict was ultimately sustained by the district court on the ground that O'Meally was negligent in the "common task of reading and heeding emails from a supervisor." Id. at 6.

O'Meally was ordered to pay a penalty of $60,000, disgorgement of $444,836 in fees he earned, and prejudgment interest. See Memorandum Opinion & Order, SEC v. O'Meally, No. 06 Civ. 6483, ECF No. 231 at 5-13 (S.D.N.Y. Mar. 11, 2013).

## DISCUSSION

O'Meally challenges the denial of his Rule 50 motion, which argued the insufficiency of evidence to show he negligently violated Sections 17(a)(2) and (a)(3). We review the denial of a Rule 50 motion *de novo*. Jones v. Town of East Haven, 691 F.3d 72, 80 (2d Cir. 2012). A court may grant judgment against a party as a matter of law if "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party." Fed. R. Civ. P. 50(a)(1). "The court must consider the evidence in the light most favorable to the non-movant and 'give that party the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence.'" Jones, 691 F.3d at 80 (quoting Zellner v. Summerlin, 494 F.3d 344, 370-71 (2d Cir. 2007)). "A Rule 50 motion may only be granted if there exists such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair minded [persons] could not arrive at a verdict against [it]." Tepperwien v. Entergy Nuclear Operations, Inc., 663 F.3d 556, 567 (2d Cir. 2011) (internal quotation marks omitted) (alterations in original).

O'Meally was found to have violated Sections 17(a)(2)-(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(2)-(3), which make it unlawful for any person in the offer or sale of any securities to:

> (2) obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order make the statements made, in light of the circumstances under which they were made, not misleading; or
>
> (3) engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. §§ 77q(a)(2)-(3). Scienter is not required to prove a defendant violated these provisions. See Aaron v. SEC, 446 U.S. 680, 696-97 (1980). A showing of negligence is sufficient. See SEC v. Dain Rauscher, Inc., 254 F.3d 852, 856 (9th Cir. 2001); Finkel v. Stratton Corp., 962 F.2d 169, 175 (2d Cir. 1992).

**I**

This Circuit has not had occasion to consider what standard of care governs a negligence claim under Sections 17(a)(2)-(3), but we need not answer that question on this appeal.

The SEC presented, and the district court recognized, two theories as to how O'Meally acted negligently: A) by unreasonably making false or misleading

1    statements to the mutual funds; and B) by unreasonably failing to follow the

2    instructions of his supervisors at Prudential.  The evidence presented at trial,

3    however, was insufficient to support either theory.

4

5                                          **A**

6          The SEC argues that O'Meally made false or misleading statements to the

7    mutual funds by using alternative FA numbers and customer account numbers to

8    conceal his trading from the mutual funds.  The SEC emphasizes that the mutual

9    funds dictated the "law" to be followed by O'Meally, Test. of Ed DiConza, J.A. at

10   294, and that he acted unreasonably by executing trades contrary to the funds'

11   stated policies.  Clear as the prospectuses and block notices were in forbidding

12   market timing, the SEC's argument fails to acknowledge the inconsistent

13   application of those policies.

14         We review the evidence in its entirety.  See Tolbert v. Queens College, 242

15   F.3d 58, 71-74 (2d Cir. 2001).  Many of the SEC's own witnesses from the funds

16   testified that exceptions were made to allow market timing.  A witness at PIMCO

17   Funds acknowledged that Canary Capital, one of O'Meally's clients, was

18   permitted to engage in market timing notwithstanding PIMCO's stated policy.

1   Prudential itself secured exceptions from the policies.  As the SEC points out, no

2   exception was made specifically for O'Meally; but our focus is on the

3   reasonableness of O'Meally's conduct, and if the funds were making exceptions

4   for others, it was not unreasonable for O'Meally to believe he could engage in

5   market timing as well.

6   O'Meally's uncontroverted evidence (or testimony elicited on cross-

7   examination) likewise supported the reasonableness of his conduct.  Prudential's

8   legal and compliance departments approved O'Meally's trading practices on

9   more than one occasion, a crucial fact in light of the jury's conclusion that he

10  acted in good faith.  One witness also explained how the use of multiple FAs had

11  legitimate purposes.

12  O'Meally argues that negligence could not be established without expert

13  testimony regarding the appropriate conduct of a person in O'Meally's position.

14  The SEC rightly points out that the necessity of expert testimony depends on

15  circumstances, and that there is no categorical rule requiring expert testimony in

16  a securities case.  Generally speaking, it is needed when the facts and concepts of

17  a case are beyond a layperson's understanding.  Cf. United States v. Wexler, 522

18  F.3d 194, 204 (2d Cir. 2008) (stating expert testimony serves to shed "light on

13

activities not within the common knowledge of the average juror" (internal quotation marks omitted)); United States v. Cruz, 981 F.2d 659, 664 (2d Cir. 1992) (referring to the "esoteric aspects reasonably perceived as beyond the ken of the jury").

Here, it cannot be said that expert testimony was necessary, or that what an expert could say would be useful.  The only evidence adduced was of deliberate acts that were carefully executed, profitable and legal.  The SEC did not propose how O'Meally's conduct might have been sloppy or ill-calculated.  Negligence was not referenced in the opening or closing arguments.  It was first brought to the jury's attention in the charge itself--without useful guidance.  Given the lawful nature of the trading technique, the absence of bad faith, the inconsistent practices, and the mixed signals from the funds (and Prudential), expert testimony could not have cured the central problem: the jury could not do more than speculate as to how a broker in O'Meally's position breached a standard of care (whatever it might be said to be).

The SEC portrays this case as being only about O'Meally's (supposedly negligent) failure to obey the funds' prohibitions.  This gross simplification reflects how little is left by way of a theory of liability.  The jury was required to

decide how O'Meally should have conducted himself in light of conflicting positions taken by the funds, and with knowledge that his employer approved of his practices.  In the absence of any evidence of negligence, no reasonable juror could have found O'Meally acted negligently towards the funds themselves in his market timing.

## B

The theory that O'Meally unreasonably failed to obey his employer's instructions enjoys even less evidentiary support.  While the firm's ostensible policy was to comply with the letters sent from the funds, it encouraged its traders to interpret such instructions in the narrowest sense, so that only the specific FA and customer numbers expressed in the letters were to be blocked; and otherwise, it was business as usual.  The SEC offered nothing to contradict this evidence, and produced no evidence that O'Meally continued to trade on the specific numbers in the block notices.  Unsurprisingly, Prudential's legal and compliance teams--and O'Meally's supervisors--all approved of his practices.  No reasonable juror could have found O'Meally liable under this theory.

## II

The SEC ultimately succumbs to its strategic choice at trial to pursue a theory of scienter or nothing. Its entire jury presentation was premised on the idea that O'Meally violated Section 17(a) through intentional conduct. The SEC's summation relied solely on intent and recklessness; theories rejected by the jury. And as to negligence, the SEC never introduced testimony or any other evidence on the appropriate standard of care against which a jury could measure O'Meally's conduct. "[T]he SEC's failure to present any evidence that [the defendant] . . . violated an applicable standard of reasonable care was fatal to its case." Shanahan, 646 F.3d at 546.

The SEC argues on appeal that it always *meant* to pursue a negligence theory. The Commission points to stray references about negligence in the parties' joint pretrial statement and the jury charge; and the complaint alleges violations of Sections 17(a)(2)-(3), which can be proven without scienter. Pleadings aside, given the "complete and utter failure of proof by the Commission," Guenthner, 395 F. Supp. 2d at 847, the "jury's findings could only have been the result of sheer surmise and conjecture." Tepperwien, 663 F.3d at 557.

**CONCLUSION**

The SEC asks us to affirm that O'Meally negligently performed an intentional act that is otherwise legal. The evidence, however, establishes without contradiction that the funds were inconsistent in their proscriptions on market timing and that Prudential supported O'Meally's practices--and the jury could not find negligence in these circumstances without evidence as to an appropriate standard of care. For the foregoing reasons, we reverse and remand for the district court to dismiss the complaint against Mr. O'Meally.

17

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit